UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| BRAD PASSWATER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:21-cv-00475-MPB-MG |
| | ) | |
| TRICIA PRETORIUS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Brad Passwater is an inmate currently incarcerated at the New Castle Correctional Facility ("NCCF" or "New Castle"). He filed a complaint alleging that, while incarcerated at the Plainfield Correctional Facility ("PCF" or "Plainfield"), defendants violated his Eighth Amendment rights while he was on suicide watch on April 16, 2020.

The correctional and medical defendants have moved for summary judgment. Dkts. 108, 111. For the reasons explained below, the defendants' motions for summary judgment, dkts. [108] and [111] are **GRANTED.**

**I.
Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court

only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Passwater and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

Plaintiff Brad Passwater has a long history of mental illness, including a diagnosis of paranoid schizophrenia. Dkt. 93 ¶ 22. Mr. Passwater was confined at Plainfield Correctional Facility during the events that gave rise to his complaint in April of 2020. *Id.* ¶ 23.

### A. Parties

Defendant Stanley Knight is the former Warden of Plainfield. Dkt. 109-7 at 1 ¶ 2. By the time Mr. Passwater initiated this lawsuit on December 29, 2021, Mr. Knight had already retired from employment from the Indiana Department of Correction ("IDOC"). *Id.* at 3-4 ¶ 9. Mr. Knight testified that, since his retirement, he has very little contact with IDOC, and they generally do not

notify him of any pending litigation against Plainfield, other facilities, and current or former employees, unless he is specifically named in the litigation. *Id.* He further testified that he does not personally keep track of lawsuits asserted against Plainfield or its employees. *Id.*

Defendant Tricia Pretorius is the current Warden of Plainfield. Dkt. 109-8 at 1 ¶ 2. Warden Pretorius is familiar with the version of the Suicide Prevention Policy ("Policy"), 4.06A, that was in effect during the events that gave rise to the complaint, and which contains the rules regarding the Suicide Companion Program ("Program"). *Id.* at 1 ¶ 3. Warden Pretorius testified that she hosted and participated in regular suicide Prevention Meetings with the Suicide Prevention Committee at Plainfield. *Id.* at 2 ¶ 6. The committee included Warden Pretorius, various medical and mental health providers, custody staff, and chaplains. *Id.* At the meetings, the committee discussed Plainfield's current suicide prevention methods, and addressed issues with practices and implementation of the suicide prevention policy. *Id.* at 2-3 ¶ 6.  In the year leading up to the events on April 16, 2020, Warden Pretorius did not recall receiving any indication that staff or suicide companions were systemically or repeatedly failing to adhere to or enforce the requirements of the Program. *Id.* at 3 ¶ 6. Specifically, she did not recall any reports of recurrent issues with suicide companions failing to adequately monitor their assigned inmate, or of staff neglecting to monitor or require suicide companions to maintain proper observation practices or otherwise uphold their duties. Warden Pretorius was not on the unit on April 16, 2020, when Mr. Passwater was actively engaged in self-mutilation while under watch of suicide companion Antoine Fox. *Id.* at 4 ¶ 8. Warden Pretorius was not aware of the incident until the emergency signal was called and Mr. Passwater was in the care of correctional and medical staff. *Id.*

Defendant Daniel Rippetoe is a psychiatrist who was contracted to provide services at Plainfield. Dkt. 114-1 at 2. Dr. Rippetoe provided services over telepsychiatry from Florida. *Id.* at

2-3. Dr. Rippetoe therefore relied on a mental health team at Plainfield that consisted of a psychologist and master level therapist. *Id.* at 3. He also relied on nursing staff to administer medications. *Id.* at 3, 5. Dr. Rippetoe recalled nursing staff had certain responsibilities for monitoring patients after the administration of medication. *Id.* at 5. Dr. Rippetoe was familiar with the IDOC psychotropic medication policy, for which he received yearly department-wide and company-wide trainings. *Id.* at 5. Dr. Rippetoe recalled several phone calls back and forth between him and medical staff on April 16, 2020. *Id.* at 6. After he was contacted by nursing staff, Dr. Rippetoe approved emergency psychotropic medication for Mr. Passwater which consisted of 50 mg of Haldol Decanoate and 5 mg of Haldol Lactate. *Id.* at 7-8.

### B. Experts

Mr. Passwater retained pharmacology expert Andrew J. Lampkins. Dkt. 113-1 at 1. Mr. Lampkins' opinion was that the overall medication regimen and dosages as ordered by Dr. Rippetoe were reasonable. *Id.* Medical defendants retained psychiatric expert Dr. Steven Berger. Dkt. 113-2 at 1. Dr. Berger's opinion was that Dr. Rippetoe's orders were the common medications and doses used in similar situations and comply with the standard of care. *Id.*

### C. Suicide Companion Program

IDOC Policy 4.06A* "Suicide and Self-Injury Prevention" was the policy that outlined the "Suicide Companion Program" and was the relevant policy related to inmate self-harm. Dkt. 109-1; dkt. 109-2 at 13:7-14. Under the Suicide Companion Program, qualifying inmates were employed to assist staff in preventing self-injury or suicide by serving as "companions." Dkt. 109-1 at 2, 17-21. The companions were specially trained to provide "constant observation" surveillance of inmates on suicide watch. *Id.* Inmates could only serve as suicide companions upon meeting certain educational, disciplinary, physical health, and mental health requirements. *Id.* at

18. Inmates who met the criteria were selected and given training on how to identify and respond to self-harm and self-injury. *Id.* The training also included job duties, reporting protocol, confidentiality, prohibited conduct and corresponding disciplinary action for failure to comply with companion duties. *Id.* at 18-19. Upon completion of training, companions were required to review and sign a copy of the Suicide Companion Agreement Form, to certify that they understood the scope of their duties. *Id.*; *See* Dkt. 109-3.

When an inmate signs the Agreement form, he attests that he will, among other things, maintain constant and direct visual observation of the inmate on suicide watch, and alert staff immediately if the offender on suicide watch displays signs of self-injurious behavior. Dkt. 109-3 at 1. When a Suicide Watch Companion is utilized, an assigned correctional staff person shall confirm that the Suicide Watch Companion maintained the visual watch by conducting routine visual checks at staggered intervals not to exceed thirty (30) minutes and noting if any problems occurred. Dkt. 109-1 at 10.

### D. Medication History

In the months leading up to April of 2020, Mr. Passwater was under orders to involuntarily receive psychotropic medications, primarily an injection of Haldol. Dkt. 109-4 at 18. Mr. Passwater testified that he believed the Haldol was effective at assisting with his control of mental illness. *Id.* Before April 16, 2020, Mr. Passwater specifically asked Dr. Rippetoe to make a change in his medication. *Id.* at 22. He wanted to switch from injections to pills. *Id.* Mr. Passwater had a discussion with Dr. Rippetoe where they decided to introduce Rispersal as an additional medication. *Id.*

Over the course of the next two to three weeks after Mr. Passwater's Haldol injections were decreased and Rispersal was introduced, Mr. Passwater felt more delusional. *Id.* at 23-24. During

this time, he had incidents with staff that resulted in his move to restricted housing and suicide watch. *Id.*

### E. April 2020 incidents

On or around April 10, 2020, Mr. Passwater had a psychiatric crisis and was placed on suicide watch, where he would remain for several days. Dkt. 93 ¶¶ 23-25. Over the next few days, Mr. Passwater used recreational and synthetic drugs. Dkt. 109-4 at 42-43. He testified: "I was smoking spice every now and again." *Id.* Mr. Passwater was on suicide watch consistently with a suicide companion outside his door from April 12 through April 16, 2020. *Id.* at 26-27.

On April 16, inmate Antoine Fox was Mr. Passwater's suicide companion. Dkt. 93 at ¶¶ 47-48. Despite orders to stand at Mr. Passwater's cell and observe him, Mr. Fox remained seated in a plastic chair where he could not see Mr. Passwater through the observational window. Dkt. 93 at ¶¶ 47-48; dkt. 109-4 at 30.

That day, Mr. Passwater heard voices his head telling him to throw toilet water on the officers and staff at his cell door. *Id.* at 29-33. Because he was throwing toilet water on prison staff, the guards sprayed him with OC. *Id.* at 28-29.

Due to his outbursts, Mr. Passwater was given an emergency injection of medication. *Id.* at 28-29. After Mr. Passwater was administered Hadol Decanoate and Haldol Lactate, he had an episode where he felt a burning sensation. *Id.* at 36-38. Mr. Passwater had previously received these injections without experiencing any burning sensation. *Id.* Mr. Passwater then pulled on his genitals, ripped out his testicles, and popped his eyeballs out. *Id.* at 36-38. He testified that felt like he was being controlled. *Id.*

6

Mr. Passwater was then found by officers and taken to the hospital. *Id.* at 36-38. He underwent several operations, but after the self-injurious incident on April 16, 2020, Mr. Passwater no longer has testicles and is blind. *Id.* at 38-39.

### III.
### Discussion

**A. Legal Standard**

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The Court assumes for purposes of the summary judgment motion that Mr. Passwater's mental illness was objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Passwater]'s health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up).

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, Mr. Passwater "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)."Of course, medical

7

professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

A failure to provide protection constitutes an Eighth Amendment violation only if deliberate indifference by prison officials to a prisoner's welfare effectively condones the harm by allowing it to happen. *Eagan v. Dempsey*, 987 F.3d 667, 693–94 (7th Cir. 2021) (citing *Santiago*, 599 F.3d at 756). Suicide and acts of self-harm may constitute serious risks to an inmate's health and safety. *See id., e.g.*, *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012) ("[P]rison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies."); *Collins v. Seeman*, 462 F.3d 757, 760-61 (7th Cir. 2006) (considering deliberate indifference in prison suicide context); *Hall v. Ryan*, 957 F.2d 402, 406 (7th Cir. 1992) (confirming "prisoner's right to be protected from self-destructive tendencies").

**B. Analysis**

   **1. Former Warden Stanley Knight**

Defendant Stanley Knight is the former Warden of Plainfield Correctional Facility. Dkt. 109-7 at 1 ¶ 2 In his amended complaint, Mr. Passwater alleges that Warden Knight was responsible for a policy that allowed for inmates on suicide watch to be monitored by untrained inmate suicide watch companions and knew that the suicide watch companions regularly failed to supervise their assigned inmates. But Defendant Knight argues that the claim against him is time barred because the amended complaint does not relate back to the original complaint pursuant to Federal Rule of Civil Procedure 15(c). The Court agrees.

"Rule 15(c) of the Federal Rules of Civil Procedure governs when an amended pleading 'relates back' to the date of a timely filed original pleading and is thus itself timely even though it

was filed outside an applicable statute of limitations." *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 541 (2010). Claims brought under § 1983 "borrow the limitations period and tolling rules applicable to personal-injury claims under state law." *Devbrow v. Kalu*, 705 F.3d 765, 767 (7th Cir. 2013). "The pertinent Indiana statute of limitations is two years." *Id.* (citing Ind. Code § 34–11–2–4).

The only two inquiries that the district court is now permitted to make in deciding whether an amended complaint relates back to the date of the original one are, first, whether the defendant who is sought to be added by the amendment knew or should have known that the plaintiff, had it not been for a mistake, would have sued him instead or in addition to suing the named defendant; and second, whether, even if so, the delay in the plaintiff's discovering his mistake impaired the new defendant's ability to defend himself. *Joseph v. Elan Mortorsports Technologies Racing Corp.* 638 F.3d 555, 559-560 (7th Cir. 2011). "A potential defendant who has not been named in a lawsuit by the time the statute of limitations has run is entitled to repose—unless it is or should be apparent to that person that he is the beneficiary of a mere slip of the pen, as it were." *Id.* at 560 (quoting *Rendall–Speranza v. Nassim*, 107 F.3d 913, 918 (D.C. Cir. 1997); *see Wood v. Worachek*, 618 F.2d 1225, 1230 (7th Cir. 1980); *Locklear v. Bergman & Beving AB*, 457 F.3d 363, 366–67 (4th Cir. 2006)).

Mr. Passwater cannot satisfy the first inquiry. Mr. Passwater filed his original complaint on December 29, 2021. Dkt. 1. That complaint did not name Warden Knight as a defendant. *Id.* By the time Mr. Passwater initiated this lawsuit on December 29, 2021, Mr. Knight had already retired from employment from IDOC. Dkt. 109-7 at 3-4 ¶ 9. Mr. Knight testified that, since he has been retired, he has very little contact with IDOC, and they generally do not notify him of any pending litigation against Plainfield, other facilities, and current or former employees, unless he is

9

specifically named in the litigation. *Id.* He further testified that he does not personally keep track of lawsuits asserted against Plainfield or its employees. *Id.* Accordingly, Mr. Knight did not know—and would have no reason to know—that Mr. Passwater would have sued him instead or in addition to Warden Pretorious. *Joseph*, 638 F.3d at 559-560.

Mr. Passwater cannot satisfy the second inquiry, either. Warden Knight was subpoenaed to testify on or around September 19, 2023, Dkt. 109-7 at 3-4 ¶ 9, which was more than a year and a half after Mr. Passwater filed his original complaint. *See* Dkt. 1. Mr. Passwater's delay in discovering his mistake impaired Mr. Knight's ability to defend himself. *Joseph*, 638 F.3d at 559-560.

Thus, Mr. Passwater's amendment to add Warden Knight as a defendant does not relate back to the amended complaint. The amended complaint was filed on December 15, 2023. Dkt. 87. The statute of limitations for claims related to Mr. Passwater's April 16, 2020, incident tolled two years later on April 16, 2022. Accordingly, any claim against Warden Knight is barred by the statute of limitations. He is entitled to summary judgment.

  2. **Warden Tricia Pretorius**

Defendant Tricia Pretorius is the current Warden at Plainfield. Dkt. 109-8 at 1 ¶ 2. Mr. Passwater proceeds on an individual capacity Eighth Amendment claims against Warden Pretorius based on allegations that she was responsible for an inadequate system whereby inmate suicide watch companions were assigned to oversee inmates on suicide watch, which ultimately resulted in Mr. Passwater's injuries. Dkt. 92 at 14.

As a general principle, prison wardens are "not liable for an isolated failure of his subordinates to carry out prison policies…" when they are "not directly involved in the day-to-day operations" of the prison and otherwise lack knowledge of or involvement in the particular instance

of policy defiance. *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (warden is not liable if they are not involved in everyday oversight and did not direct the misconduct); *Sinn v. Lemmon*, 911 F.3d 412, 423 (7th Cir. 2018) (the warden is not liable if he or she lacks knowledge of the claimant's "individual circumstances"). However, a warden can be held liable for a specific instance of their staff failing to uphold prison policy if the administrator had prior knowledge of a "systematic lapse in enforcement of a policy critical to ensuring inmate safety" and neglected to take action to ensure compliance. *Sinn*, 911 F.3d at 423 (citing *Steidl*, 151 F.3d at 741) (internal quotations omitted).

" [A]n inmate cannot show a widespread practice of an unconstitutional nature, such as a custom of ignoring prison policy, by pointing to isolated incidents…" *Sinn*, 911 at 741 (citing *Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 1998)) (internal quotations omitted). Rather, pre-existing knowledge of global policy nonconformity is demonstrated with "evidence of a series of bad acts" that the defendant "was bound to have noticed, like a pervasive pattern of [inmate self-injury]…" *Id*. at 741 (quoting *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000)) (internal quotations omitted).

Warden Pretorius is familiar with the version of the Suicide Prevention Policy ("Policy"), 4.06A, that was in effect during the events that gave rise to the complaint, which contains the rules regarding the Suicide Companion Program ("Program"). Dkt. 109-8 at 1 ¶ 3.

Warden Pretorius testified that she hosted and participated in regular suicide Prevention Meetings with the Suicide Prevention Committee at Plainfield. *Id.* at 2 ¶ 6. The committee included Warden Pretorius, various medical and mental health providers, custody staff, and chaplains. *Id.* At the meetings, the committee discussed Plainfield's current suicide prevention methods, and addressed issues with practices and implementation of the suicide prevention policy. *Id.* at 2-3 ¶ 6.

In the year leading up to the events on April 16, 2020, Warden Pretorius did not recall receiving any indication that staff or suicide companions were systemically or repeatedly failing to adhere to or enforce the requirements of the Program. *Id.* at 3 ¶ 6. Specifically, she did not recall any reports of recurrent issues with suicide companions failing to adequately monitor their assigned inmate, or of staff neglecting to monitor or require suicide companions to maintain proper observation practices or otherwise uphold their duties. *Id.* Mr. Passwater has presented no evidence to rebut her testimony.

It undisputed that Warden Pretorius was not on the unit on April 16, 2020, when Mr. Passwater was actively engaged in self-mutilation while under the watch of a suicide companion Mr. Fox. *Id.* at 4 ¶ 8. Warden Pretorius was not aware of the incident until the emergency signal was called and he was in the care of correctional and medical staff. *Id.* Warden Pretorius cannot be held liable for an isolated failure of her subordinates to carry out prison policies because she was not directly involved in the day-to-day operations on the suicide watch unit. *Steidl*, 151 F.3d at 741. Similarly, Warden Pretorius cannot be held liable for this specific instance of failure to uphold the Program, because she had no prior knowledge of "systematic lapse in enforcement of a policy critical to ensuring inmate safety" and therefore could not have neglected to take action to ensure compliance. *Sinn*, 911 F.3d at 423 (citing *Steidl*, 151 F.3d at 741) (internal quotations omitted).

It is clear that Mr. Passwater's suicide companion, Antoine Fox[1] failed to uphold his duties under the Suicide Companion Agreement Form given that he evidently failed to maintain constant and direct visual observation of Mr. Passwater, and alert staff immediately upon Mr. Passwater's signs of self-injurious behavior. *See* Dkt. 109-3 at 1. And it is also evident that the correctional officers assigned to ensure that Mr. Fox maintained the visual watch also failed to adhere to policy,

---

[1] The record contains no evidence of Mr. Fox's qualifications to be selected as a suicide companion. The record only contains information regarding the policy that governs the criteria and selection process for suicide companions.

since the record does not reflect that routine visual checks were conducted at staggered intervals not to exceed thirty (30) minutes in accordance with the policy. *See* Dkt. 109-1 at 10. But this departure from IDOC policy does not equate to a constitutional violation. *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) ("Section 1983 protects against constitutional violations, not violations of departmental regulation and practices.").

At most, Mr. Passwater testified of one incident between April 12 and April 16, 2020, when he thought a suicide watch-companion was sleeping. Dkt. 109-4 at 51. But Mr. Passwater did not testify that he told any IDOC staff about the sleeping inmate. *See generally id.* Otherwise, the record shows no other instances where an inmate or staff member deviated from the policy. One instance is not enough to show "evidence of a series of bad acts" that the defendant "was bound to have noticed, like a pervasive pattern of [inmate self-injury]…" *Sinn*, 911 at 741 (quoting *Turbin v. County of Wood*, 226 F.3d at 531; *see also Goka v. Bobbitt*, 862 F.2d 646, 652 (7th Cir. 1988) (suggesting that thirteen (13) prior instances of the alleged policy noncompliance at-issue in the two-year period preceding the claimant's injuries could evidence prior knowledge of systemic noncompliance). Though the events that gave rise to this action are certainly unfortunate, "… [Mr. Passwater] cannot show a widespread practice of an unconstitutional nature, such as a custom of ignoring prison policy, by pointing to isolated incidents…" *Sinn*, 911 at 741 (citing *Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 1998)) (internal quotations omitted). Warden Pretorious is entitled to summary judgment in her favor.

### 3. Doctor Daniel Rippetoe

Dr. Rippetoe is entitled to summary judgment on the deliberate indifference claim against him. Mr. Passwater contends that Dr. Rippetoe was deliberately indifferent because he ordered Mr.

Passwater to be involuntarily medicated and failed to direct anyone to monitor him afterward. Dkt. 1, *see also* Dkt. 92 at 14.

Dr. Rippetoe admits that Mr. Passwater's mental health condition on April 16, 2020, constitutes a serious medical need. Dkt. 112 at 14. Accordingly, the first prong is satisfied. However, the undisputed record reflects that Dr. Rippetoe was not deliberately indifferent to Mr. Passwater's serious medical need as to satisfy the second prong of his Eighth Amendment claim.

After he was contacted by nursing staff on April 16, Dr. Rippetoe approved emergency psychotropic medication for Mr. Passwater which consisted of 50 mg of Haldol Decanoate and 5 mg of Haldol Lactate. Dkt. 114-1 at 7-8. Dr. Rippetoe had several phone calls back and forth between him and medical staff that day. *Id.* at 6.

Both Mr. Passwater and Medical Defendants retained experts in this case. The expert witnesses retained by Medical Defendants and Mr. Passwater agreed that Dr. Rippetoe acted within the standard of care. Mr. Passwater's pharmacology expert Andrew J. Lampkins' opinion was that the overall medication regimen and dosages as ordered by Dr. Rippetoe were reasonable. Dkt. 113-1 at 1. Medical defendants' psychiatric expert Dr. Steven Berger's opinion was that Dr. Rippetoe's orders were the common medications and doses used in similar situations and comply with the standard of care. Dkt. 113-2 at 1.

Further, Dr. Rippetoe acted reasonably in assuring Mr. Passwater was properly monitored after receiving psychotropic medication. Because Dr. Rippetoe provided services over telepsychiatry, dkt. 114-1 at 2-3, he relied on a mental health team at the facility that consisted of a psychologist and master level therapist, as well as nursing staff to administer medications. *Id.* at 3, 5. Further, Dr. Rippetoe knew nursing staff had certain responsibilities for monitoring patients

14

after the administration of medication. *Id.* at 5. Dr. Rippetoe was familiar with the IDOC psychotropic medication policy. *Id.* at 5.

Dr. Rippetoe had every reason to believe that the medical staff who were physically present at the facility would abide by the IDOC psychotropic medication policy. Dr. Rippetoe cannot be held accountable for the actions or inactions of those medical or correctional staff physically present at the facility and interacting with Mr. Passwater the day of the incident. "'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). For this purpose, each defendant is considered independently. *Id.* No reasonable jury could find that Dr. Rippetoe acted with deliberate indifference. Accordingly, summary judgment is appropriate.

### 4. Wexford of Indiana, LLC

The Court allowed a *Monell* claim to proceed against Wexford. Dkt. 8 at 6, dkt. 92 at 14. However, Mr. Passwater withdrew this claim against Wexford. Dkt. 121 at 1. Accordingly, the Court need not address any of the briefing as it relates to Defendant Wexford, as the claims against it were voluntarily dismissed.

## IV.
## Conclusion

Defendants' motions for summary judgment, dkts. [108] and [111] are **GRANTED**. Because this matter will not proceed to trial, judgment consistent with this Entry shall now issue.

**SO ORDERED.**

Dated: January 2, 2025

Matthew P. Brookman, Judge
United States District Court
Southern District of Indiana

Distribution:

BRAD PASSWATER
145785
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
P.O. Box E
NEW CASTLE, IN 47362

All Electronically Registered Counsel